Burnets *v.* Scranton Coal Company, Appellant.

Argued March 4, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Paul G. Collins,* with him *James W. Scanlon, Frank L. Martin* and *M. J. Martin,* for appellant.

*Roger J. Dever,* for appellee.

OPINION BY JAMES, J., October 2, 1935:

On March 10, 1932, Michael Burnets, husband of the claimant, while pushing a car with two other men on the cage at the foot of the shaft of the Pine Brook Colliery of the defendant, was struck on the right arm by a "chunk" of coal which fell down the shaft. He was shortly taken to the Hahnemann Hospital, where his arm was dressed. The examination at the hospital disclosed no other injuries. He then went to his home and was treated daily at the office of the company physician. An X-ray was taken March 14, 1932, from which it appeared that the decedent suffered a subperiosteal fracture at the upper end of the right ulna, in perfect position and alignment. A cast was applied and decedent then reported to the company physician twice a week for four weeks and the cast was then removed. The decedent failed to report for further treatments, and after a period of a week the company physician went to the decedent's home where he found the decedent and received the explanation that the family physician, Dr. Kulczycki, was treating him for grippe. Dr. Kulczycki visited the decedent first on April 12th and found him in a very weak condition suffering from severe pain in his back and left side; his leg was swollen and a large swelling on his left side below the kidney. He visited him again on the 16th and 18th and on April 22nd, the decedent was removed to the hospital where he died April 23, 1932.

A post-mortem was performed on the day of death by the county coroner, Dr. Bartecchi. His findings were thus summarized by the compensation board: "The coroner found no external evidence of injury. He did

find a perinephritic hematoma, a hemorrhage around the kidneys that extended downward into the iliac fascia, about six or seven inches in length and three or four inches in width, caused by the rupture or leakage of the renal vessels, either of the renal artery or renal vein; and also an impaction in the left lung ......
The kidney itself was intact and was not ruptured; and the substance of the hematoma was blood."

It is not disputed that the direct cause of death was an infarct pneumonia; that the pneumonia was caused by the hematoma, and the hematoma was of traumatic origin. The main question in issue is whether there is sufficient evidence to sustain a finding that the hematoma was a result of the accident on March 10, 1932.

A hearing was had on the widow's claim for compensation and the referee disallowed compensation. Upon appeal the workmen's compensation board filed an opinion which stated in part: "The family physician has testified that he can say this (hematoma) was of traumatic origin, that the man died from traumatic injury which broke the blood vessel and formed the hematoma. He dates this of some weeks duration, back to the accident of March 10th; he assumes that decedent was struck with such force as to cause a slow leakage, either by a severe bending or was directly hit ....... .
...... the family physician had found a well sized hematoma eleven days before the man's death, and we have no means of knowing how long it may have taken to form at that time ......"; that when the coal struck the decedent: "It was a startling event, it evidently caused some pain, for he then grabbed his arm, and in a slightly stooped position, swung at right angles on the axis of the body and cried, 'Oh, my poor arm.' The question, as we see it, is whether or not this sudden effort in swinging or twisting the body around, with the left side of the body fairly well drawn, caused a slow leakage of the left renal vessel." The board re-

turned this record of facts in order that the several physicians may be recalled for further hearing on the question as put by the board, and also appointed Dr. Ferguson as an impartial expert to aid the referee. A second hearing was held at which time the family physician testified that the decedent had told him that when he was struck by the coal "he twisted himself to the right and at the same time felt very severe pain like cutting with a knife in the heart." Having read the facts as found by the board, Dr. Ferguson testified as follows: "The chief point of interest seems to me is whether his injury caused his hematoma. The pneumonic process from which he died was probably secondary to the hematoma. I believe that the injury did cause the hematoma, because of these facts: In the first place, at the time of the injury the patient complained of a,—as the Board puts it,—funny feeling in the region of the umbilicus, which would have represented a tear of a renal vessel, probably a renal vein. Secondly, during the man's treatment, according to the Board's records, the man felt weak,—too weak to walk. That was in about the second or third week. Thirdly, it is very definitely stated, according to the record, by both the physician for the claimant and for the company, that such a hemorrhage must be produced by trauma, and with this I agree. The question to be raised then is could the trauma, four weeks previously, have produced a hematoma as large as was noted on the thirty-third day of this man's disability. Such a hematoma could very well have been produced by an injury thirty-three days before ...... death, yes, or before it was found." He further testified: "Traumatism does not necessarily mean there has to be a blow from without to produce the rupture of the vessel. In other words, a twist or a strain may produce or does produce just as much traumatism as a blow from without." Dr. R. V. White and Dr. E. P. Larkin examined the decedent

when he was admitted to the hospital and found no evidences of an injury to any other part of the body than that of the arm and both expressed the opinion that the hematoma had no relationship to the accident which happened on March 10th. At the second hearing Dr. R. V. White upon the facts as found by the board still was of the opinion that the accident of March 10th had no causal relation to the hematoma. The referee awarded compensation, which was affirmed by the board and by the court of common pleas.

The appellant now objects to the board's findings upon which Dr. Ferguson based his opinion that upon being struck "the decedent grabbed his right arm and swung his body around in a slightly stooped position until his body faced his companion on the right and cried, 'Oh my poor arm,'" and as the board stated in its general discussion of what it regarded as the known facts: "It was a startling event, it evidently caused some pain for he then grabbed his arm and in a slightly stooped position, swung at right angles on the axis of the body and cried, 'Oh, my poor arm.'" In referring to the record we find that W. J. Melley, who worked with the decedent, testified: "Q. Did he, as far as you know, wrench his body in any way? A. Just turned around that way. Q. And grabbed hold of his arm, did he? A. Yes, sir. Q. What did he say? A. 'Oh, my poor arm.' ...... Q. Mike as soon as he was hit immediately hollered and turned around quickly? A. Yes. I didn't say he hollered. He said, 'Oh, my poor arm' and took hold of it and turned around like that." James Langan, who also worked with the decedent, testified: "Q. Whether or not he stooped over or bent over at the time? A. He just swung his body around and faced me. Q. Was he stooped or standing erect? A. Just a slight bend like that, holding the arm, 'Oh, my poor arm.'" Dr. Kulczycki testified that the decedent reported to him: "After he got up he felt very funny below his

umbilicus, his umbilical lower part, and he never felt before like that." We are satisfied that the excerpts from the evidence, quoted above, were sufficient to justify the finding of the board now objected to by appellant.

The appellant further contends that the finding by the board that the twist of the body ruptured a renal vessel is not supported by evidence. However, Dr. Bartecchi testified: "Q. Now were you able, doctor, to point out or pick out the vessel where this hematoma first originated? A. It was one of the renal vessels. Q. How many renal vessels are there? A. The renal artery and renal vein. Q. You think it was either one of those two? A. Yes, sir." We think this was sufficient to support the board's finding.

The appellant further raises the objection that the procedure adopted by the board, in submitting its findings of facts upon which the opinion of the expert was based, rather than the entire record, was improper. Had the entire record been submitted to him and properly examined by the submission to him of a hypothetical question based upon the testimony on the record, it clearly would have been proper: Jones v. United Iron & Metal Co., 99 Pa. Superior Ct. 394; Beishline v. Pardee, 114 Pa. Superior Ct. 71, 173 A. 700, and if the expert bases his opinion upon the finding of facts made by the board and opportunity has been given to examine and cross-examine, as was done in the present case, we find no ground for complaint. This complaint is well answered in the opinion of the court below when he stated: "In view of the fact that the Board is the official body appointed by the legislature to find the facts and the expert testified from the facts as found by the Board it would seem that his testimony would be entitled to more credit than if he attempted to find the facts from the record, as he is unfamiliar with the process of finding facts from the reading of testimony."

Appellant also contends that as the testimony of Dr. Bartecchi called by the claimant was in disagreement with that of Dr. Ferguson called by the board, the claimant has failed to sustain the burden of proof, relying upon the rule laid down in Mudano v. P. R. T., 289 Pa. 51, 137 A. 104. Dr. Bartecchi's testimony clearly indicates that he was not called as an expert by the claimant to show a causal connection between the accident of March 10, 1932 and the hematoma. His examination in chief was confined to what he had found at the post-mortem and what was the cause of a hematoma and not until he was turned over for cross-examination was he interrogated as to the relationship between the arm injury and the kidney condition, when he testified they had no direct relationship. As we understand the theory of the claimant no claim is made that the arm injury directly caused the hematoma but that the startling injury to the arm caused the sudden twist and strain of the body producing the condition disclosed by the post-mortem. Further, when Dr. Bartecchi's testimony was given, he did not have the benefit of the testimony of the eye-witnesses to the accident, whose testimony has been above noted. The testimony of Dr. Bartecchi was solely of his own knowledge obtained at the post-mortem, while Dr. Ferguson's testimony was based on the board's findings of fact and a fair analysis does not disclose such contradictions and conflictions that the adoption of Dr. Ferguson's opinion as against that of Dr. Bartecchi would be nothing more than a guess. Neither do we believe that Dr. Bartecchi's testimony was binding upon the claimant. He was not asked by the claimant to express his opinion as to any causal relation between the accident and the kidney condition and as was said in Borovski v. P. & R. C. & I. Co., 101 Pa. Superior Ct. 304, 307: "The defendant should have confined the cross-examination to the same matters as were testified by the witness in chief and if he wished

him to give his opinion as an expert he should have called him as his witness." Under these circumstances, the rule of Mudano. v. P. R. T., supra, does not apply.

Judgment affirmed.